0.958 ACRES, MORE OR LESS; 1.1004 acres, More or Less; 1.137 acres, More or Less; O. Nelson Parrish; James A. Parrish; Lance C. Parrish; Albert G. Parrish; Daniel B. Parrish; the Parrish Company, a partnership, Appellants,

v.

STATE of Alaska, Appellee.

No. S–2339.

Supreme Court of Alaska.

Sept. 30, 1988.

Joseph W. Sheehan, Fairbanks, and James A. Parrish and Lance C. Parrish, Parrish Law Office, APC, Fairbanks, for appellants.

E. John Athens, Asst. Atty. Gen., Fairbanks, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

The State condemned an approximately 100–foot-wide strip of the Parrishes' land to build a controlled access highway. Included in the condemned land was a 33–foot-wide strip to which the State already owned a section line right-of-way. At the time of the condemnation, the Parrishes' land and the right-of-way were undeveloped.

The superior court awarded $0.40 per square foot for the condemned land other than the land within the right-of-way, and nominal damages of $300 for the condemned fee interest in the land underlying the right-of-way.

The Parrishes appeal. They seek compensation for the taking of their right of direct access to the section line right-of-way and for loss of reasonable access to

the remainder of their property. They also seek more than nominal damages for the condemnation of their fee interest underlying the right-of-way. We remand for further findings relating to whether the remaining access is reasonable, and affirm on the other issues.

## I.

The Parrish Company bought 80 acres of undeveloped land in the Fairbanks area in 1974.[1] The northern boundary of the property was a section line.

The deed which conveyed the parcels to the Parrish Company stated that the conveyance was subject to "[r]oad rights of way reserved by statute...." Alaska Statute 19.10.010 dedicates a 66–foot-wide right-of-way centered on the section line for use as a public highway.[2] Half of the width of this right-of-way is on the south side of the section line, encumbering the land purchased by the Parrish Company.

In 1975, the Parrish Company subdivided the property into four 20–acre parcels, each abutting the section line on its northern border. See Appendix. The company sold the easternmost parcel and distributed the other three parcels to the Parrish partners in unequal shares. The company later reacquired the southern ten acres of the 20–acre tract it sold.

In order to build a controlled access highway, on September 23, 1983, the State filed a declaration of taking condemning a 1,980–foot-long strip running east and west along the northern edge of the Parrishes' property. The northern edge of the condemned strip is the section line. The strip is approximately 100 feet in width from north to south. Thus, the State condemned land both within and without the section line right-of-way, totalling approximately 4.7 acres. See Appendix. The declaration stated that

> [a]n estate in fee simple, together with all easements or any other rights of ingress or egress to, from or across the controlled access facility to or from the abutting land, is taken....

The State deposited $42,000 with the court, representing the State's estimate of just compensation.

After a hearing, a master found that just compensation should be $174,600 as of the date of the declaration of taking. This included $0.40 per square foot for the land outside the section line right-of-way, and no value for the fee interest in the land underlying the right-of-way. It also included $120,600 for damages "to the remainder or residue of landowner's property by reason of the severance of the part taken from the landowner's entire property."

The State appealed the master's award to the superior court. The parties stipulated that the State's condemnation of the fee interest in the land underlying the section line easement constituted a " 'taking' for which payment of just compensation is constitutionally mandated...."[3]

In two memorandum decisions and orders, the superior court granted summary judgment in favor of the State. The court found that the Parrishes suffered no compensable taking of direct access because reasonable access remained after the condemnation, and that the Parrishes should receive only nominal damages for the condemnation of the fee interest in the land underlying the right-of-way. The court entered final judgment, awarding the Parrishes just compensation of $54,296.08 plus costs and fees of $75,951.85.

The Parrishes appeal.

---

1. The Parrish Company is a partnership of appellants O. Nelson Parrish, James Parrish, Lance Parrish, Albert Parrish, and Daniel Parrish.

2. The parties agree the right-of-way is an easement of land owned in fee by the Parrishes, rather than a strip of land owned in fee by the State. See Andersen v. Edwards, 625 P.2d 282, 284 n. 1 (Alaska 1981).

3. Later, the State moved the court to set aside this stipulation on the ground that the State made an error of law. The court denied the motion, ruling that the stipulation was a correct statement of law. The State did not appeal that determination.

## II.

### A. *Right of direct access*

The Parrishes argue that (1) one of the property rights they possessed prior to the condemnation was the right of direct access to the section line easement; (2) the State took this property right; and (3) they should be compensated for this taking. Further, they argue that the rule of "reasonable remaining access" does not apply when a right of direct access is taken. We address whether the Parrishes ever possessed such a property right.

■ The general rule in Alaska is that an abutter to a public highway owns a right of reasonable access to it. *Triangle, Inc. v. State*, 632 P.2d 965, 967 (Alaska 1981). In *Triangle*, we stated:

All jurisdictions recognize that an owner of abutting land has a right of access to and from a public street or highway. In Alaska, this incident of ownership is limited to a "right of *reasonable* access." This rule is in accord with that adopted by a majority of jurisdictions.

In *B & G Meats [Inc. v. State*, 601 P.2d 252 (Alaska 1979)] we set forth the principles controlling a claim of taking caused by a change in access to streets or highways:

"No hard and fast rule can be stated, but courts must weigh the relative interests of the public and the individual and strike a just balance so that government will not be unduly restricted in its function for the public safety, while at the same time, give due effect to the policy of eminent domain to insure the individual against an *unreasonable* loss occasioned by the exercise of the police power. ... While an abutter has the right of access to the public highway system, it does not follow that he has a direct-access right to the main traveled portion thereof; circuity of travel, so long as it is not unreasonable, is non-compensable."

*Id.* (citations and footnote omitted; emphasis in original). We concluded that Triangle, Inc. "never possessed a right of direct access" to the adjacent highway; "its only right was to reasonable access." *Id.* (emphasis omitted).

■ *Triangle* and *B & G Meats* involved changes in access to prior existing highways, while the instant case involves construction of a highway where none existed before. Ordinarily, landowners have no guaranteed right of access to a newly constructed highway. *Schnider v. State*, 38 Cal.2d 439, 241 P.2d 1, 3 (1952); *Moore v. State Highway Comm'n*, 191 Kan. 624, 383 · P.2d 549, 551 (1963); *Smick v. Commonwealth*, 268 S.W.2d 424 (Ky.App.1954); *D'Arago v. State Roads Comm'n*, 228 Md. 490, 180 A.2d 488, 489–91 (1962); *Morehead v. State, Dep't of Roads*, 195 Neb. 31, 236 N.W.2d 623 (1975); *State v. Calkins*, 50 Wash.2d 716, 314 P.2d 449, 450–51 (1957). However, where construction of a new limited access highway cuts off some preexisting access to other streets, that loss of access is compensable. *Small v. State Roads Comm'n*, 246 Md. 646, 229 A.2d 408, 409, 410 (1967) (landowner entitled to compensation where construction of new limited access street cut off preexisting right-of-way to Viers Mill Road). In the instant case the section line easement provided the Parrishes with a potential means of access to Peger Road, because under appropriate circumstances a landowner may build a privately financed access road on a section line easement. *See Andersen v. Edwards*, 625 P.2d 282, 284–85, 286 n. 6 (Alaska 1981). As a result of the condemnation, however, this potential access no longer exists, and their only access to Peger Road is through one of a variety of alternative routes discussed below. Under our holdings in *Triangle* and *B & G Meats*, the Parrishes are entitled to compensation if the remaining access is unreasonable.

■ The Parrishes argue that because they had direct access to and a fee interest in the former easement, they should now have direct access to the highway. We disagree. Nothing in AS 19.10.010 suggests that the owners of the servient estates of section line easements are guaranteed a right of direct access to any highways that may be built on these easements.

Moreover, such a rule would be inconsistent with the purpose of the statute, which was to provide easements on which it would be relatively easy and inexpensive for the state to build highways. Compensation for loss of direct access would have the opposite effect: it would greatly increase the cost of constructing controlled access highways on section line easements. Indeed, this cost could conceivably be higher than the cost of acquiring a fee interest where no easements and thus no rights of access exist, leading to the absurd result that it could be more expensive for the state to build new highways on section line easements than elsewhere.

■ We thus interpret AS 19.10.010 consistently with its purpose and hold that a section line easement does not guarantee the owner of the servient estate a right of direct access to any highway the state may choose to build there. It follows that when the state condemns the fee interest in land in which it owns a section line easement, as in the instant case, it owes no compensation for the loss of access to the easement, since no preexisting right was taken. Only if the taking deprives the landowner of reasonable access to the network of streets to which it previously had access would the state owe compensation. *See Small*, 229 A.2d at 410.

We affirm the superior court's determination that the Parrishes' loss of direct access is not compensable. The Parrishes are entitled to compensation only for any loss of reasonable access to Peger Road brought about by the condemnation of the former section line easement.

## B. *Nominal damages*

■ The superior court determined that the Parrishes should receive only nominal

damages for the taking of their fee interest in the land underlying the right-of-way, since the Parrishes had not established that the fee had any "special value" such as mineral or resource rights.[4] The Parrishes appeal this ruling.[5]

This issue can be separated into two parts: (1) whether actual damages rather than nominal damages must be awarded regardless of the absence of special value; and (2) whether, even if nominal damages are sometimes appropriate, the court erred in determining that the Parrishes' fee interest in the land underlying the right-of-way had no special value. The Parrishes do not adequately brief the first part of this issue.[6] Therefore, we decline to address it. *See Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 156 (Alaska 1987). We will assume in this case that nominal damages are appropriate for condemnation of the fee underlying a highway right-of-way unless there is a showing of special value.

The Parrishes argue that their fee had special value because it gave them a right of access to the section line easement. In light of our holding that the Parrishes' fee interest did not give them any additional right of access to the section line, their special value argument fails. We affirm the superior court's determination that nominal damages are appropriate in this case.

## C. *Reasonable access*

The Parrishes argue that their remaining access is unreasonable, and therefore the superior court erred in not awarding damages for the diminution of value of the uncondemned portion of their property.[7]

4. The superior court cited Annot., 17 A.L.R. 1249 (1922); *People v. Schultz Co.*, 123 Cal.App. 2d 925, 268 P.2d 117, 126 (1954); and *Romero v. Department of Pub. Works*, 17 Cal.2d 189, 109 P.2d 662, 666 (1941).

5. To expedite this appeal, the parties agreed on $300 as a suitable measure of nominal damages.

6. The argument that nominal damages are never appropriate is omitted from the Parrishes' principal brief, and presented in a single sentence in their reply brief: "The State did not

appraise landowners' fee interest in this property despite the statutory requirement to do so." The Parrishes fail to cite any authority that supports their argument.

7. We have previously held that the question of remaining reasonable access can be decided on summary judgment. *See Triangle*, 632 P.2d at 967–68. *See also Ault v. State*, 688 P.2d 951, 957 (Alaska 1984) ("[t]he question whether a compensable claim for loss of access is presented is for the court, rather than the jury").

■ If the remaining access is reasonable, then the mere diminution of prior access does not amount to a taking or damage of a cognizable property interest such as would require compensation under the federal or state constitution. In *Triangle*, 632 P.2d at 969 n. 9, we

> reject[ed] Triangle's argument that because the change in accessibility to its property diminished the value of the property, the loss is necessarily compensable. Government activity in pursuit of social goals often has a detrimental effect upon the value of some real property. Unless this detriment rises to the level of a "taking" or "damage" within the meaning of art. I, § 18 of the Alaska Constitution, however, there is no right to compensation.

The question whether the Parrishes' remaining access is reasonable is plainly a matter of degree. We cannot simply compare the number of lineal feet of accessible road frontage before and after the condemnation, as the Parrishes suggest in their brief. Nor can it be answered by simply comparing the properties' value before and after the condemnation, as the Parrishes also suggest.[8] Instead, it involves and ad hoc analysis of the roads that actually or potentially lead to the property after the condemnation, to determine if they are suitable for the traffic that would likely go to the property.

■ We think the analysis necessarily involves an examination of the potential uses of the property.[9] The use of the property will influence the number, size, and type of vehicles requiring access. Access that is reasonable for a single-family dwelling may be entirely unreasonable for an industrial subdivision. Furthermore, even if a road to the property is capable of handling the expected traffic, that road may not provide reasonable access if a river or cliff cuts it off from a major usable part of the property.[10] In this case, the superior court erred by determining that the remaining access was reasonable without finding and taking into account the highest and best use of the property.

Both parties agree that the highest and best use of the property prior to the condemnation was to subdivide it into small tracts for industrial use. Typical uses for such tracts include truck and trailer sales, warehousing, and equipment storage. The record indicates that the highest and best use remained unchanged after the condemnation.[11]

The superior court determined that four access routes remain into and out of the Parrishes' properties; a 33–foot–wide easement running north and south along the

---

8. The proper measure of damages in a condemnation proceeding is the difference in the property's fair market value before and after the taking. *See, e.g., State v. Doyle,* 735 P.2d 733, 735 (Alaska 1987). However, a preliminary question in a case such as the present one is whether there has been constitutionally cognizable damage. If no constitutionally cognizable damage occurred, no compensation is required regardless of diminution of value.

9. *See, e.g., LaBriola v. State,* 36 N.Y.2d 328, 368 N.Y.S.2d 147, 148, 328 N.E.2d 781, 782 (1975) (discussing access for highest and best use of property after a condemnation); *Douglas County v. Briggs,* 34 Or.App. 409, 578 P.2d 1261, 1265 (1978) (citing 2 Nichols, *Eminent Domain* § 5.72(1) at 5–165 (1976)).

10. For example, a slough flows across the Parrish properties. *See* Appendix. The parties do not argue that the slough poses enough of an impediment to render access via Truck Street unreasonable. However, this is the type of natural impediment which deserves attention.

11. For example, Karl Sopp, an appraiser retained by the Parrishes testified several times that the highest and best use after the condemnation was the same as before the condemnation, but the Parrishes would have to dedicate a road in order to gain subdivision approval from the Borough authorities. Similarly, James Price, an appraiser called on behalf of the State, testified that the condemnation did not damage the rest of the property. Although access to the section line right-of-way would no longer exist, he thought there was "sufficient other access available to the properties where it wouldn't be really a hindrance to them." The only contrary testimony was from Jeff Cook, an appraiser called on behalf of the Parrishes, who stated that the condemnation affected the viability of such a subdivision. He indicated that the remaining access to the Parrishes' land is "totally out of the main track" and "in a different world for industrial ground."

western edge of the Parrishes' land, encumbering the adjacent property;[12] a 25-foot-wide easement of record running east and west along the southern border of the Parrish properties to Peger Road; and Truck Street and Trailer Street, which are 50-foot-wide gravel streets running north and south connecting Cartwright Road (now called Van Horn Road), an improved highway south of the Parrishes' properties, to the southern boundary of their properties.[13] See Appendix.

We recognize that the Parrishes' remaining access, via Truck or Trailer Streets and Cartwright Road, is circuitous. However, we do not find this circuity alone unreasonable. While the loss of less circuitous potential access to Peger Road via the section line easement may have adversely affected the properties' market value, that alone does not make the loss compensable. See Triangle, 632 P.2d at 967.

However, a problem with the remaining access is that the easement along the properties' southern border may fail to meet minimum street width requirements for subdivisions, as established by Fairbanks North Star Borough ordinances. Those ordinances at the relevant time required roads that access the various lots in a subdivision to be 50 feet in width.

■ The easement of record along the southern border is 25 feet wide, encumbering the land to the south of the Parrish properties. The parties disagree about whether there is an additional easement encumbering the southern 25 feet of the Parrish property. If such an easement exists, the total width of the two easements would be 50 feet.

In 1975, the Parrish Company subdivided its 80-acre tract into four 20-acre parcels by waiver of the applicable subdivision regulations. Attached to the Parrish Company's application for waiver was a diagram of the proposed subdivision which specifically showed that the easement along the southern boundary of the property was 50 feet wide, not 25, extending all the way to Peger Road.

The State argues that the Parrishes' actions constituted a common law dedication of an additional 25 feet on their side of the southern boundary, all the way to Peger Road.

We explained common law dedication in Swift v. Kniffen, 706 P.2d 296, 301 & n. 2 (Alaska 1985) (footnote and citation omitted; emphasis in original):

There are two essential elements of a common law dedication: (1) an owner's offer of dedication to the public and (2) acceptance by the public. The crux of the offer requirement is that the owner must somehow objectively manifest his intent to set aside property for the public's use.

These requirements are met in the instant case.

The Parrishes objectively manifested an intent to dedicate the twenty-five foot strip in their 1975 application to the Borough for a waiver of the subdivision regulations. The letter requesting the waiver was based on an attached sketch, which clearly delineated a strip along the southern edge of the property. The strip was identified: "50' easement—25' each side of line...." Unlike the landowner in Swift, the Parrishes never made any effort to revoke this offer. Cf. Swift, 706 P.2d at 301 (owner "engaged in 'sufficient activities to negate any presumed intent to dedicate to the public.' ") Just three weeks later, the Borough granted the request on the basis of the Parrishes' letter, thereby accepting the offer of dedication which was an integral part of the Parrishes' request. Based on these facts, we agree with the State that the Parrishes' actions constituted a common law dedication to the public of a 25-foot-

12. This access affects only the westernmost of the three Parrish parcels at issue in this case.

13. Truck and Trailer Streets terminate against the southern boundary of the Parrish parcels. The terminus of Truck Street is situated so that 25 feet of it abuts the western parcel and 25 feet of it abuts the center parcel. The terminus of Trailer Street is situated so that 25 feet of it abuts the center parcel and 25 feet abuts the eastern parcel.

wide strip along the southern boundary of their property.[14]

In summary, the superior court must determine whether the remaining access is reasonable for industrial subdivision of each of the subject parcels, given that the width of the southern easement is fifty feet. If the remaining access is unreasonable but if it could be remedied by the Parrishes dedicating some portion of their land to the public, then the State must compensate them for that portion of their land. If the remaining access is reasonable, the Parrishes are not entitled to compensation for the amount of land they would have to dedicate to achieve access comparable to what it was prior to the condemnation.

■ In order to subdivide their properties, the Parrishes may now have to dedicate more land for rights-of-way than they would have in the absence of the condemnation.[15] However, we decline to adopt the Parrishes' suggestion that the State must compensate them for that increased burden. Our reasons are as follows.

First, it is too speculative to have experts testify as to possible subdivision plans to determine how much more land the owner would have to dedicate after the condemnation than before, when the planning authority has not considered or approved any of those plans.

Second, when a controlled-access highway is created, abutting landowners whose access is changed are forced to bear other types of reasonable expenses, including increased development costs. We see little difference between those other increased development costs and additional dedication of land. The fact that dedication is to the public does not sway us, when it is for the private economic gain of the landowner. To require compensation whenever a landowner's future development might require more dedication than in the absence of the condemnation would be to favor subdividers over other land users, since it is only subdividers that need to dedicate land to the public.

We conclude the Parrishes are entitled to access that is reasonable but not necessarily comparable to what it might have been in the absence of the condemnation. So long as their access is reasonable, the potential burden of increased dedication is non-compensable.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.[16]

14. Alternatively, the Parrishes might be estopped from claiming the easement is only 25 feet wide. Estoppel requires "the assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice." *Jamison v. Consolidated Utils., Inc.*, 576 P.2d 97, 102 (Alaska 1978) (footnote omitted). The State argues that the Parrishes are estopped because they depicted a 50–foot easement on their subdivision waiver application; the Borough accepted the Parrishes' waiver application; and the absence of such an easement would cause prejudice to the public. We need not resolve this question.

15. Various experts speculated that, had the condemnation not occurred, each 20–acre property might have been subdivided into a quadrant of four 5–acre parcels. Appraiser James Price observed that, prior to the condemnation, such a layout would require the Parrishes to dedicate additional rights-of-way to the southern parcels not touching Truck Street or Trailer Street.

Price believed that, after the condemnation, one practical way to develop the properties into 5–acre parcels would be to extend Truck Street and Trailer Street to the north and then have each parcel abut those roads. To develop the properties in that configuration would require the Parrishes to dedicate more of their own land for roads. One surveyor stated in an affidavit that "[t]his access at a minimum will require the use of 3–⅓ acres of additional land which were not required in the before situation."

16. The Parrish Company also argues that (1) it owned an easement encumbering the eastern edge of the easternmost of the three parcels at issue here; (2) the State took a small portion of that easement; and (3) the Parrish Company is entitled to just compensation for that taking. The superior court made no ruling on this issue. On remand, we direct the superior court to determine whether the issue was properly before it, and if so, to resolve it.